IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE

Assigned on Briefs January 14, 2025 at Jackson

## STATE OF TENNESSEE v. TYLER MICHAEL BENSON

**Appeal from the Criminal Court for Hamilton County**
**No. 312760    Amanda B. Dunn, Judge**

_____

### No. E2024-00438-CCA-R3-CD

_____

The Defendant, Tyler Michael Benson, appeals the Hamilton County Criminal Court's denial of his motion to withdraw his guilty pleas to aggravated sexual battery and aggravated kidnapping, arguing that his pleas were involuntary and unknowing due to his "mental health impairments," his trial counsel's ineffective assistance, and "the miscommunication regarding probation eligibility." Based on our review, we affirm the judgment of the trial court denying the motion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN W. CAMPBELL, SR. J., delivered the opinion of the court, in which J. ROSS DYER and MATTHEW J. WILSON, JJ., joined.

Lanni Marchant, Chattanooga, Tennessee, (on appeal), and Christopher H. Jones, Chattanooga, Tennessee (at trial), for the appellant, Tyler Michael Benson.

Jonathan Skrmetti, Attorney General and Reporter; G. Kirby May, Assistant Attorney General; Coty Wamp, District Attorney General; and Nicole Evans, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### FACTS

On January 26, 2022, the Hamilton County Grand Jury indicted the Defendant for aggravated rape, especially aggravated kidnapping, aggravated assault, two counts of rape, patronizing prostitution and possession of legend drugs without a prescription. The

offenses arose out of the Defendant's actions on July 19-20, 2021, in picking up a prostitute in Chattanooga, taking her to his home, telling her that she was going to be his sex slave, holding her at his home against her will, drugging her, and repeatedly raping her vaginally, orally, and anally, including during periods in which she was unconscious.

On November 2, 2022, the trial court ordered a forensic evaluation of the Defendant to determine his competency to stand trial and his mental condition at the time of the offenses. The Defendant was first evaluated on an outpatient basis at the Johnson Mental Health Center, which determined that the Defendant "<u>currently</u> d[id] not appear to have sufficient present ability to consult with his attorney with a reasonable degree of rational understanding and a rational as well as factual understanding of the proceedings against him" and recommended further inpatient evaluation. The Defendant was then evaluated on an inpatient basis at Middle Tennessee Mental Health Institute, which found him competent to stand trial and that "[t]here [was] no support for the insanity defense or diminished capacity." The Defendant was found "not committable" and was recommended for transfer back to the Hamilton County jail with the continuation of his prescription medications. The Defendant's discharge paperwork from Middle Tennessee Mental Health Institute showed diagnoses of "[b]ipolar disorder, current episode manic severe with psychotic features[,]" "Asperger's syndrome[,]" and "[t]obacco use disorder, severe, in sustained remission."

On May 10, 2023, the Defendant entered guilty pleas in the first two counts of the indictment to aggravated sexual battery and aggravated kidnapping with the sentences to be determined by the trial court after a sentencing hearing. Pursuant to the terms of his negotiated plea agreement, the remaining counts of the indictment were dismissed. The prosecutor recited the factual basis for the pleas at the guilty plea hearing:

> Had the State gone to trial and what we anticipate showing at a sentencing hearing on this matter is that on or about July 19[], 2021, in Hamilton County, [the Defendant] picked up a prostitute around the 2100 block of East 23rd Street and dr[ove] her back to his residence.
>
> Upon arrival at that residence, he kidnapped her, drugged her, and violently raped her repeatedly while he held her hostage inside the house until she was able to escape the next day.
>
> Officers were dispatched to this call due to the postal service man seeing . . . the victim, as she was escaping the residence. The U.S. Postal Service was able to help her get away when law enforcement was called.

Law enforcement interviewed [the victim]. She let them know what happened, that the [D]efendant told her he was going to make her his sex slave and forced her to have sexual encounters with him. She believes she was drugged.

Officers obtained a search warrant for this offense and, upon search of the house, found items that corroborated [the victim's] testimony.

Following the filing of the presentence report, to which was attached the Defendant's mental health records, the trial court requested to hear from the forensic examiner who had evaluated the Defendant at the Middle Tennessee Mental Health Institute. At that November 29, 2023 WebEx hearing, Dr. Rena Isen, a licensed psychologist, testified that she was certified as a forensic examiner in the State of Tennessee and had conducted the Defendant's forensic examination from March 2 through March 24, 2023. She concluded that the Defendant was competent and that an insanity defense could not be supported because the Defendant appeared to understand his behavior at the time of the offenses, to understand that the behavior was against the law, and to understand and appreciate the proceedings and the charges against him, and to be able to assist his counsel in his defense.

On cross-examination, Dr. Isen acknowledged her opinion, as reflected in her report, was that the Defendant had a serious mental illness. She agreed that her report reflected that the Defendant had a diagnosis of "bipolar 1 disorder and Asperger's syndrome[,]" that the Defendant presented with auditory hallucinations, that psychological testing did not indicate that the Defendant was malingering, and that the Defendant had "a history of outpatient and inpatient mental health treatment for mood and psychotic symptoms."

On redirect examination, Dr. Isen testified that an individual's having a mental illness did not mean that the individual met the definition of incompetency. Upon questioning by the trial court, she testified that, in her opinion, the Defendant's auditory hallucinations did not impair his ability to communicate with his attorney or to understand what was going on in the courtroom. She stated that the Defendant was experiencing auditory hallucinations at the time of her evaluation but that they did not affect his ability to communicate with her.

At the February 9, 2024 sentencing hearing, the State introduced several exhibits, including the Defendant's presentence report and Psychosexual Evaluation. The State also presented four witnesses: Tennessee Department of Correction Probation and Parole Officer Kristina Creekmore, who prepared the presentence report; Deputy Charlene Cook of the Hamilton County Sheriff's Office, the first officer who encountered the victim after her escape from the Defendant's home; Detective Jason Maucere of the Hamilton County

Sheriff's Office, who investigated the case; and Detective Daniel Francis of the Chattanooga Police Department, who investigated 2012 assaults and robberies of three Chattanooga prostitutes in which the Defendant was identified as a suspect, charged, and ultimately entered a guilty plea to aggravated assault. Detective Francis testified that the Defendant brought up Ted Bundy during his initial encounter with him on the front porch of the Defendant's home and discussed Ted Bundy and other serial killers during his interview at the police department, expressing his desire to emulate Ted Bundy. The State introduced as exhibits recordings of both the front porch encounter and the custodial interview at the police station.

The Defendant's presentence report reflected that the thirty-four-year-old Defendant had two 2020 guilty plea convictions for domestic violence and a 2012 guilty plea conviction for aggravated assault. According to the testimony of Probation and Parole Officer Creekmore, the victims in the domestic violence cases were the Defendant's father and mother. The Defendant reported that he had graduated from high school and attended two years of college; that he had attended "Joe Johnson and Hiwassee Mental Health" and been diagnosed with bipolar disorder, paranoid schizophrenia, and autism; and that he had attended "Celebrate Recovery" for addiction issues including alcohol and "pornographic addiction[.]" The Defendant reported having jobs in the past as a cashier and a stocker, stated that he was currently on disability, and reported that he lived in a home adjoining his parents. The Defendant was accessed with a "low overall risk" on the Strong-R assessment.

In his psychosexual assessment, the Defendant acknowledged having had vaginal and oral sexual intercourse with the victim but claimed that the encounters were consensual. He denied engaging in anal intercourse, that he prevented the victim from leaving, or that he drugged the victim. The Defendant reported that he had been placed in a psychiatric facility for ten to fourteen days in the spring of 2019 for "behavioral problems[,]" and that he had been diagnosed with ADHD, Intermittent Explosive Disorder, Bipolar Disorder and Paranoid Schizophrenia.

The Defendant reported that his aggravated assault conviction occurred after he and a prostitute argued about money, and he hit her in the head with a hammer. He denied any other criminal history. The Defendant reported that his only sexual encounters were with prostitutes, that he had had sexual intercourse with a total of thirty prostitutes over the course of his life, and that he daily viewed pornography and masturbated.

In an allocution to the court, the Defendant stated that he had been raised in the church, realized that "this episode in [his] life [was] big and serious," and wanted the trial court to know that he was a changed man. He said that he no longer wanted to watch or

think about pornography or serial killers, that what had happened would never again happen, and that he would never kill anyone.

During closing arguments, defense counsel requested that the trial court grant the Defendant a sentence of eight years on supervised probation. In response, the prosecutor pointed out that, pursuant to Tennessee Code Annotated section 40-35-303(a), the offenses to which the Defendant pled were not eligible for probation. She said she had sent an email to defense counsel on May 17, 2023, with that information, and that defense counsel had acknowledged it was correct.

At the conclusion of the sentencing hearing, the trial court found several enhancement factors applicable and no applicable mitigating factors except for the catchall mitigating factor of the Defendant's history of auditory hallucinations and mental illness, s*ee* Tenn. Code Ann. §40-35-113(13), to which the trial court evidently assigned slight weight:

> There is no question that the Court has had concerns about [the Defendant's] mental health throughout this process. The forensic evaluation that was performed in this case, [Defendant], found that you were competent to proceed with the sentencing hearing and also found that the defense of insanity could not be supported and I agree with that assessment.

> I will say that again reviewing all of the medical records that were attached to the presentence investigation report caused this Court exceptional concern because I believe that you have been diagnosed with bipolar disorder and paranoid schizophrenia and that you hear auditory hallucinations. There are times you have put earplugs in to avoid auditory hallucinations. There are times that you have been at Middle Tennessee Mental Health or Moccasin Bend Mental Health and come out of your room because you thought you heard people calling your name, so I believe that you do have auditory hallucinations, I think that's documented and I think that is something to consider in your motivation.

The trial court sentenced the Defendant to twelve years for the aggravated sexual battery conviction and to ten years for the aggravated kidnapping conviction. Finding that the Defendant was a dangerous offender, the trial court ordered that the sentences be served consecutively, for a total effective sentence of twenty-two years at 100% in the Tennessee Department of Correction.

On February 15, 2024, the Defendant filed a motion to withdraw his guilty pleas pursuant to Rule 32(f)(2) of the Tennessee Rules of Criminal Procedure. The Defendant

alleged that his guilty pleas were unknowing and involuntary because trial counsel did not "effectively communicate or advise" him that his offenses were not eligible for probation, which left the Defendant operating under the belief that probation was a possibility. The Defendant asserted that the prosecutor's May 17, 2023 email communication to trial counsel was made during a time when trial counsel was experiencing "life changing personal challenges including lethal threats and acts of violence outside and inside his home[,]" the effects of which "consumed counsel" and caused trial counsel's attention to be diverted from the Defendant's case. In support of trial counsel's incompetence, the Defendant attached to the motion police reports relating to trial counsel's reports of having been stalked, harassed, and threatened by a neighbor.

At the February 29, 2024 hearing on the motion to withdraw the guilty pleas, the Defendant testified that trial counsel told him that the Defendant "was probably" going to receive a probationary sentence of eight to twelve years. He did not recall trial counsel's ever informing him that the offenses were not eligible for probation. He identified the plea agreement he signed on May 10, which stated that he was entering an open plea. He said he understood that meant that the judge would be setting his sentence and agreed that nowhere on the agreement did it state that the offenses were not eligible for probation. He stated that he would not have accepted the plea agreement if he had known that the offenses were not eligible for probation. He recalled that he and trial counsel discussed the fact that the trial judge was a former defense attorney who would know if there were any "psychiatric places for [him]," and how other states, such as Texas, could "put somebody in . . . a mental institute[.]" He testified that trial counsel told him that he "was going to get between eight to twelve years' probation or a mental institute[.]"

On cross-examination, the Defendant acknowledged that he told the trial court during the plea colloquy that he had attended two years of college and had no problems reading, writing, or understanding the plea agreement or the court proceedings. He further acknowledged that the trial court, among other things, reviewed in detail the charges and punishments he faced, the offenses to which he was pleading, and the fact that the trial court would be determining the sentences. He agreed that the trial court never told him that probation would be an option, and that the plea agreement did not reflect that probation was an option. He conceded that he assured the trial court that he was entering the agreement freely and voluntarily and that no one had made him any promises "regarding the outcome of the case or any sentence [he would receive] other than what was contained in the plea paperwork[.]"

The Defendant identified three recorded telephone calls he made to his mother from the jail on April 13, 2023, May 9, 2023, and May 10, 2023, which were admitted as exhibits and played during the hearing. The Defendant acknowledged that he never said anything about receiving probation during those telephone calls, and that he made statements to his

mother indicating that he understood he would be serving his sentence in prison. He testified that he believed he was going to serve eight to twelve years but also acknowledged having explained to his mother that the trial court could sentence him to the maximum by ordering consecutive sentences or could order "concurrent mean[ing] . . . between eight and twelve."

On redirect examination, the Defendant agreed that trial counsel never showed him the statute reflecting that the offenses to which he pled were not eligible for probation. He recalled, however, that several months after the entry of his pleas, trial counsel showed him the presentence report which "talked about probation being available[.]" On recross examination, he agreed that he did not see the presentence report until after he entered his pleas, and that his recorded jail calls to his mother indicated that, at the time he entered the pleas, he believed that probation was not an option.

In closing argument, trial counsel expressed his belief that he was ineffective for not knowing the law and not urging the Defendant to accept a twelve-year offer that the State had made in April of 2023. Trial counsel apologized for being distracted by personal issues during that period and urged the trial court not to hold it against the Defendant.

The trial court concluded that the Defendant failed to meet his burden of establishing that his guilty pleas should be withdrawn to avoid manifest injustice. Among other things, the trial court found that the Defendant's recorded jail telephone calls, as well as the Defendant's own testimony, "directly contradict[ed] what [trial counsel] present[ed] that he told his client." Specifically, the trial court found that the recorded jail telephone calls clearly showed that the Defendant understood at the time he entered his pleas that he would receive a sentence to serve. The trial court noted that probation was never discussed during the conversations and that the Defendant at one point referred to possibly serving twenty-four years, while at another point mentioning that the trial court could sentence him to eight years, or to fifty years. The trial court additionally noted that the Defendant was an intelligent man who had attended college and that he responded appropriately during the plea colloquy indicating that he was entering his pleas knowingly, intelligently, and voluntarily.

## ANALYSIS

The Defendant contends that the record shows that he did not enter the pleas knowingly and voluntarily due to his "mental capacity issues" and the ineffective assistance of trial counsel, who misinformed and misled him about the possibility of probation. He argues that the trial court abused its discretion by denying the motion "based . . . solely on the [Defendant's] testimony and not on the totality of the circumstances[,]" which included his documented severe mental health issues and trial counsel's admission

that he failed to accurately advise him of the consequences of his pleas. The State argues that the trial court acted within its discretion in denying the motion because the record shows that the Defendant was competent and knowingly and voluntarily entered his pleas. We agree with the State.

Tennessee Rule of Criminal Procedure 32(f) provides that a trial court may grant a motion to withdraw a guilty plea for any fair and just reason before the sentence has been imposed. Tenn. R. Crim. P. 32(f)(1). After the sentence has been imposed but before a judgment becomes final, "the court may set aside the judgment of conviction and permit the defendant to withdraw the plea to correct manifest injustice." Tenn. R. Crim. P. 32(f)(2). "[A] judgment of conviction entered upon a guilty plea becomes final thirty days after acceptance of the plea agreement and imposition of sentence." *State v. Green*, 106 S.W.3d 646, 650 (Tenn. 2003). We review a trial court's determination regarding a motion to withdraw a guilty plea for an abuse of discretion. *State v. Phelps*, 329 S.W.3d 436, 443 (Tenn. 2010). An abuse of discretion occurs when a trial court "applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, . . . applies reasoning that causes an injustice to the complaining party[, or] . . . fail[s] to consider the relevant factors provided by higher courts as guidance for determining an issue." *Id.* (internal citations omitted).

Rule 32(f) does not provide "a criminal defendant who has [pleaded] guilty . . . a unilateral right to later withdraw his plea either before or after sentencing." *Id.* at 444; *see State v. Crowe*, 168 S.W.3d 731, 740 (Tenn. 2005); *State v. Mellon*, 118 S.W.3d 340, 345 (Tenn. 2003). "The defendant bears the burden of establishing sufficient grounds for withdrawing [a] plea." *Phelps*, 329 S.W.3d at 444; *see State v. Turner*, 919 S.W.2d 346, 355 (Tenn. Crim. App. 1995). Manifest injustice has been found when:

> (1) the plea "was entered through a misunderstanding as to its effect, or through fear and fraud, or where it was not made voluntarily"; (2) the prosecution failed to disclose exculpatory evidence as required by *Brady v. Maryland* . . . and this failure to disclose influenced the entry of the plea; (3) the plea was not knowingly, voluntarily, and understandingly entered; and (4) the defendant was denied the effective assistance of counsel in connection with the entry of the plea.

*Crowe*, 168 S.W.3d at 742 (citations omitted). A defendant's "change of heart" about pleading guilty, "dissatisfaction" with the punishment imposed, or entry of a guilty plea to avoid a harsher sentence does not constitute a manifest injustice. *See Turner*, 919 S.W.2d at 355.

In *Boykin v. Alabama*, 395 U.S. 238, 242 (1969), the United States Supreme Court held that there must be an affirmative showing in the trial court that a guilty plea was voluntarily and knowingly given before it can be accepted. A plea is not "voluntary" if it results from ignorance, misunderstanding, coercion, inducements, or threats. *Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn. 1993). The trial court must determine if the guilty plea is knowing by questioning the defendant to make sure he or she fully understands the plea and its consequences. *State v. Pettus*, 986 S.W.2d 540, 542 (Tenn. 1999); *Blankenship*, 858 S.W.2d at 904. Because the plea must represent a voluntary and intelligent choice among the alternatives available to the defendant, the trial court may look at a number of circumstantial factors in making this determination. *Blankenship*, 858 S.W.2d at 904. These factors include: (1) the defendant's relative intelligence; (2) the defendant's familiarity with criminal proceedings; (3) whether the defendant was represented by competent counsel and had the opportunity to confer with counsel about alternatives; (4) the advice of counsel and the court about the charges against the defendant and the penalty to be imposed; and (5) the defendant's reasons for pleading guilty, including the desire to avoid a greater penalty in a jury trial. *Id.* at 904-05.

The record easily supports the determination that a manifest injustice has not occurred and that the Defendant is not entitled to withdraw his guilty pleas. The transcript of the guilty plea hearing reflects, as the Defendant acknowledged at the hearing on the motion to withdraw his pleas, that the Defendant responded appropriately to the trial court's questions, affirming that he understood his plea agreement and was entering his guilty pleas knowingly and voluntarily. The Defendant's recorded jail telephone calls to his mother clearly demonstrate that he understood, both before and after entering his pleas, that he would be receiving a sentence to serve. Moreover, the Defendant acknowledged as much on cross-examination at the hearing. The Defendant's contention that the trial court failed to properly consider the evidence of his mental illness and trial counsel's acknowledgment of shortcomings is belied by the record, which shows that the trial court considered both but ultimately determined that the Defendant entered his pleas knowingly and voluntarily and without the misunderstanding that he could receive probation. We, therefore, conclude that the trial court did not abuse its discretion in denying the motion.

## CONCLUSION

Based on our review, we affirm the judgment of the trial court denying the motion to withdraw the guilty pleas.

s/ John W. Campbell
JOHN W. CAMPBELL, SR., JUDGE

- 9 -